[1] ON REMAND
[4] This action commenced as a suit in contract by two corporations, Directional Wireline Services, Inc. (DWS) and Directional Wireline Equipment Co., Inc. (DWE) against one of their stockholders, Ray O. Tillett, to compel specific performance of a contract to sell Tillett's shares in the corporations back to the corporations. Tillett (who also had been an employee) filed a reconventional demand against DWS, DWE and two corporate stockholders, Henry R.J. Cournoyer and Darwin A. Miller, cumulating actions in tort and contract for (1) damages for failure to produce corporate records necessary to calculate the "true book value" of his stock, (2) specific performance for payment by the corporations to him of the book value sale price of his stock, (3) an accounting for payment of all dividends due to him, and (4) payment of personal injury and property damage for intentionally inflicting mental anguish on him. Prior to trial, DWS and DWE dismissed the main demand with prejudice. A trial by jury resulted in the following verdicts: (1) DWS, DWE, Cournoyer and Miller *West Page 1203 
were obligated to buy Tillett's stock at a book value of $130,000; (2) DWS and DWE wrongfully withheld $59,000 in advanced dividends from Tillett; (3) Tillett properly made demand on DWS and DWE to examine corporate records; DWS, DWE, Cournoyer and Miller refused in bad faith to allow Tillett to inspect the records; and Tillett suffered costs, expenses, attorney fees and damages of $243,000 because of this refusal; and (4) DWS, DWE, Cournoyer and Miller acted in an atrocious, outrageous and utterly intolerable manner toward Tillett which caused him mental anguish damages of $350,000 and no property damages. The trial court rendered a judgment in accordance with these verdicts. DWS, DWE, Cournoyer and Miller filed motions for a new trial, judgment notwithstanding the verdict (JNOV) and remittitur. After a hearing, the trial court partially granted a JNOV and held (1) Cournoyer and Miller were not liable with DWS and DWE to buy Tillett's stock and (2) the liability of DWS, DWE, Cournoyer and Miller to Tillett for intentionally inflicting mental anguish was reduced from $350,000 to $25,000. The motion for a new trial was denied, and, in all other respects, the motion for JNOV was denied. The motion for a remittitur was not acted upon. An amended judgment was rendered in favor of Tillett against DWS and DWE for $189,000 ($130,000 for the value of the DWS and DWE stock and $59,000 for advanced dividends) and in favor of Tillett against DWS, DWE, Cournoyer and Miller for $268,000 ($243,000 for costs, expenses, attorney fees and damages for refusal to permit inspection of corporate records and $25,000 for intentionally inflicting mental anguish). DWS, DWE, Cournoyer and Miller took this suspensive appeal. Tillett answered the appeal and asserted the granting of the partial JNOV and the rendering of an amended judgment were error. This court inDirectional Wireline Services, Inc. v. Tillett,540 So.2d 1103 (La.App. 1st Cir. 1989) affirmed in part, and reversed and remanded in part, holding that the trial court erred as a matter of law in not granting appellant's motion for a new trial. On application of Tillett, the Louisiana Supreme Court peremptorily granted a supervisory writ stating the following:
[5] The judgment of the court of appeal is vacated. The case is remanded to the court of appeal to consider and decide on the record before the court of appeal. [541 So.2d 1386 (La. 1989)]
[6] FACTS
[7] On May 28, 1973, Directional Wireline Services, Inc. was incorporated as a Louisiana business corporation. Tillett commenced his employment with the corporation in 1974. In 1979 Tillett was promoted to the position of general manager of the corporation. In that capacity he supervised the daily operations of the corporation. Tillett was allowed to buy stock in the corporation and was elected vice-president of the corporation. Darwin A. Miller was president and Henry R.J. Cournoyer was secretary-treasurer. The corporation had 55 shares of outstanding stock which were owned as follows: Tillett 10 shares (18.18%), Landon Miller, 4 1/2 shares, Cournoyer 20 1/4 shares and Darwin A. Miller 20 1/4 shares.
[8] In February of 1980, the original Directional Wireline Services, Inc. reorganized for tax purposes. The original corporation was renamed Directional Wireline Equipment Company, Inc. (DWE) and all of the operating equipment stayed in this corporation. A new corporation was formed and named Directional Wireline Services, Inc. (DWS). This corporation performed the services with DWE's equipment. The incorporators of the new corporation (DWS) were the stockholders of DWE; each incorporator of DWS was given the same number of shares of stock in DWS as he had in DWE. The officers of both corporations were the same, and Tillett was the general manager of both. Each corporation was qualified as a subchapter S corporation for federal income tax purposes, and, thus, the corporate profits were not taxable as income to the corporations, but were taxable as the personal income of the stockholders. DWE and DWS operated on an April 30 fiscal year. At the end of each fiscal year the net profits of each corporation *West Page 1204 
were paid to the shareholders on a pro rata basis. DWE was operated on an accrual accounting basis, and DWS was operated on a cash accounting basis. With cash accounting, accounts receivable are not used to determine income, whereas in accrual accounting they are.
[9] The articles of incorporation of DWE and DWS each provided for a right of first refusal as a condition precedent to the sale of corporate stock to a third person. The provisions are similar but not identical. Article VIII of the articles of incorporation of DWE provides as follows:
[10] In the event that any shareholders of this corporation desire to sell any share of stock, he must first offer said stock to the other stockholders at the then existing book value of said stock, and must allow thirty (30) days after making the offer for an acceptance or refusal on the part of the remaining shareholders; the begibning [sic] of the thirty days shall be at the time the written notice is either actually given to the shareholders, or from the time that said written notice has been delivered to their last known address, which is as stated in these Articles of Incorporation, unless otherwise recorded differently in the books of the said corporation. (Emphasis added).
[11] Article XI(A) of the articles of incorporation of DWS provides as follows:
[12] No stock in this corporation shall be transferred unless the stock shall have been first offered for sale to the corporation, and, if the corporation shall fail or refuse to accept the offer, to each of the other stockholders of this corporation in the proportion of their then existing ownership of stock. The offeree shall have an option to purchase the stock to be transferred at the following price: At the book value determined as of the date the stock shall have been first offered to the corporation. Book value shall be determined by the certified public accountant then employed by this corporation and shall be binding on all parties. The offer shall be in writing and shall set forth the price and terms on which the stock is offered. It shall be sent by registered mail to the President and Secretary of the corporation and to each stockholder at the address listed on the corporation books. The right to transfer stock shall not exist until the corporation and all existing stockholders either refuse in writing the offer so made, or waive the requirement of an offer in writing, or until, they fail for a period of thirty (30) days after receipt of the written offer to accept it by compliance with the terms therein set forth. Regulations as to the formalities and procedures to be followed in effecting the transfer may be prescribed in the by-laws of the corporation. (Emphasis added).
[13] The principal differences between the DWE and DWS provisions are that (1) DWE stock need only be offered to the DWE stockholders, whereas the DWS stock must be first offered to the corporation, and then to the stockholders if the corporation refuses to accept and (2) the DWS articles provide for a method of computing book value, whereas the DWE articles do not.
[14] In 1980 Mr. and Mrs. Tillett decided to build a new home. On November 12, 1980, they obtained interim construction financing of $200,000 from the First National Bank of Houma (FNB). On May 20, 1981, this interim loan was converted into permanent financing as a $200,000 loan evidenced by a demand collateral mortgage note. The loan was scheduled to be paid by five consecutive annual installment payments of $40,000 each, plus accumulated interest, with the first payment due on July 1, 1982. At this time Tillett was receiving $5,400 per month from DWS and DWE, which sum represented $2,700 in salary as general manager and $2,700 as an advance on his pro rata share of the profits. Tillett's total annual income was approximately $250,000.
[15] The Tilletts went over budget in the cost of construction of their new home. On July 1, 1981, they borrowed an additional $40,000 from FNB to cover cost overruns. At Tillett's request, Cournoyer endorsed a $40,000 note to FNB to secure the loan. Cournoyer was elected to the FNB board of directors in July of 1981 and has remained on the board since then. *West Page 1205 
[16] In March of 1982, Mrs. Tillett went to see Francis I. Bourque, Jr., a certified public accountant who did the tax work for DWS and DWE. Bourque gave Mrs. Tillett a handwritten statement which indicated that as of January 31, 1982, Tillett was entitled to $112,669 in salary and profits from DWE and DWS.
[17] On March 30, 1982, Darwin Miller advised Tillett that his employment with DWE and DWS was terminated. Tillett was paid through April 30, 1982. Tillett retained legal counsel and by letter dated April 2, 1982, addressed to Darwin Miller, Cournoyer and Landon Miller, counsel for Tillett advised, in pertinent part, as follows:
[18] Specifically, it is Mr. Tillett's intention to offer for sale to the respective corporations, all of his right, title and interest in and to all shares of corporate stock which he owns in the two corporations. The express intention of this communication is to comport with Article XI of the Articles of Incorporation of the Directional Wire line Services, Inc. corporation (apparently changed to Directional Wire line Equipment Co., Inc. by amendment of date, February 6, 1980). Pursuant to the said Article XI, Mr. Tillett offers all of his said shares of corporate stock at present book value.
[19] I shall expect to hear from you or your legal representative within thirty (30) days from your receipt of this certified letter. If you should have any question[s] or desire information in regard to this matter, please contact me directly. (Emphasis added).
[20] This offer does not comply with the DWE articles of incorporation because it is made to the corporation and not the "other stockholders". It does not comply with the DWS articles of incorporation because it does not set forth the "price and terms on which the stock is offered".
[21] On or before April 12, 1982, the Tilletts sold their old home for $63,000. After satisfying first and second mortgages and settlement charges on the property, they received an equity balance of $18,688.81.
[22] On an unspecified date in April of 1982, Bourque gave Tillett's attorney a preliminary statement indicating that as of February 28, 1982, the DWE stock was worth a minus $142,017, the DWS stock was worth $623,261 and Tillett's 18.18% share of the net of $481,244 was worth $87,496.
[23] In April of 1982, Diane Baker, the assistant vice-president with FNB who was in charge of Tillett's loans, heard that Tillett had been fired. She scheduled a meeting with Tillett on April 19, 1982, to update his financial statement and discuss the loan. Baker's April 22, 1982, report to the bank concerning this meeting states the following:
[24] After a personal interview with Mr. and Mrs. Tillett on April 19, 1982, it was disclosed to me that Mr. Tillett was still making a $54,000.00 annual salary with Directional Wireline Services and that his annual bonus was to remain at $100,000. 00, and that his employment did not change.
[25] FNBH is aware of the fact that Mr. Tillett is no longer employed by D.W.S., Inc., which was verified when I called for Mr. Tillett at his office and was told by the receptionist that he no longer worked there. It is shameful that Mr. Tillett was untruthful with me after all that has been done for him by this bank.
[26] During the interview I had with the borrowers, Mr. Tillett updated his personal financial statement, which reflects a million dollar value on stock he owns with D.W.S., Inc. Since the borrower does claim ownership of this valuable stock, it should cause him no hardship to pay off our loan.
[27] . . . . .
[28] RECOMMENDATION: It is recommended that the borrowers be billed for the entire loan amount plus accrued interest no later than July 1, 1982.
[29] In her trial testimony, Mrs. Tillett denied attending the meeting between Mr. Tillett and Baker. Mr. Tillett identified his signature on the April 19, 1982 financial statement and testified he went to the bank alone but did not remember giving the financial statement to Baker. *West Page 1206 
[30] DWS, DWE, Landon Miller, Cournoyer and Darwin Miller retained counsel and by letter dated April 27, 1982, said counsel advised Tillett's counsel as follows:
[31] My clients acknowledge receipt of your letter of April 2, 1982 and accept the offer of Mr. Tillett to purchase the shares of stock that he owns in both of the aforesaid corporations at book value in accordance with and in conformity to the articles of incorporation of said corporations.
[32] We shall have our CPA firm compute the value of Mr. Tillett's stock and will make this available to you in the immediate future. Please advise Mr. Tillett that my client is willing to work with him in selecting an independent certified public accountant, should he deem it necessary.
[33] We look forward to consummating the stock transfer immediately.
[34] By letter dated May 4, 1982, counsel for Tillett advised counsel for the corporations and their shareholders as follows:
[35] I am in receipt of your recent letter communication of April 27, 1982, in regard to the above referenced matters. At the outset, please be advised that I recently met with the accountant for your clients' corporations, Mr. Francis Bourque, Jr. Mr. Bourque provided me with two hand-written papers purportedly evidencing the book values of the two corporations as well as the sums due and owing both unto my client by the corporations as well as purportedly owed to the corporations by my client. Obviously, these statements evidence the monetary intentions of your clients with regard to the purchase of Mr. Tillett's stock. Suffice it to say at this juncture, that my client's appreciation of the value of his stock in the corporations is substantially different from that of Mr. Bourque. While it is my client's intention to sell his respective shares in the subject corporations, such transfer must be made in accordance with realistic valuations fully supported by factual data.
[36] To this end, it is my client's desire to be furnished with the following information. Please forward to me the corporate depreciation schedules for the 1979, 1980, 1981 and 1982 corporate fiscal years; the itemized list of all corporate movable property, including vehicles, wireline units, pipe recovery tools, and other properties of any significant value, whether fully depreciated at this time, or otherwise; a list of all expenditures made in rebuilding, repairing, or otherwise rendering modifications to all company movables during the fiscal years 1979, 1980, 1981 and 1982; a full list of all investment portfolios regarding investment expenditures, investment income and investment losses since January 1, 1977, through the present date, made by or through the use of assets or funds owned by each respective corporation; all corporate financial statements of each of the respective corporations since January 1, 1977, through the present date; as well as all computations rendered by Mr. Bourque and/or any other certified public accountant relied upon in the preparation of figures for book value and stockholder distributions tendered to me as of April 27, 1982.
[37] Also on May 4, 1982, counsel for Tillett retained Eugene J. Kliebert, a certified public accountant, to help him determine the book value of the stock. Kliebert requested the information contained in the second paragraph of the May 4, 1982 letter.
[38] By letter dated June 11, 1982, counsel for the corporations and the shareholders advised Tillett's counsel as follows:
[39] With regard to Mr. Tillett's offer to sell his stock in Directional Wireline Services, Inc. and Directional Wireline Equipment Co., Inc., which was accepted by my clients, I have requested Bergeron, Broussard Co. to furnish financial statements as of March 31, 1982 in order to determine the book value of Mr. Tillett's stock. In accordance with the articles of incorporation of both of said companies, and based upon the enclosed financial statements, as well as Mr. Broussard's letter of June 11, 1982, you will see that the book value of Mr. Tillett's stock is a negative figure.
[40] My clients have authorized me to make an offer of $50,000.00 for Mr. Tillett's *West Page 1207 stock in both of said companies. In addition to the cash payment offered herein, my clients have further authorized me to advise Mr. Tillett that any and all claims of said companies for sums due by Mr. Tillett to said companies will be forgiven. This offer is being made in the spirit of compromise and in appreciation of prior services rendered by Mr. Tillett to said companies. Please be advised that my clients are ready and willing to purchase Mr. Tillett's stock as outlined above immediately. Please advise me within the next fifteen (15) days as to the date open which Mr. Tillett desires to consummate this transaction.
[41] If Mr. Tillett does not honor his contract to sell his stock as per the prior offer and my clients' acceptance, we are prepared to commence legal action in order to compel Mr. Tillett to sell his stock as per his offer. (Emphasis added).
[42] Counsel for Tillett responded to this letter with a letter dated June 24, 1982, which advised as follows:
[43] Initially, my client has authorized me to reject the $50,000.00 offer for the purchase of his corporate stock. It is Mr. Tillett's firm belief that his interest in these companies is provably in excess of the amount which you have offered. In this regard, my letter communication to you of May 4, 1982, was drafted. Suffice it to say, we have not been provided with any of those matters respecting the fiscal status of the respective corporations as of the present date. We have only been provided with two "Financial Statements", provided by Bergeron, Broussard Co. As expressed by Bergeron, Broussard Co., the financial statements have not been audited or reviewed by the accountants nor founded upon information other than that represented to be factual by management. Additionally, Bergeron, Broussard Co. has declared in the attached "Compilation Report" that the accounting basis utilized in the preparation of the financial statement as of March 31, 1982, for Directional Wireline Services, Inc., was not in accordance with generally accepted accounting principles.
[44] It is further noted that the representations made by Mr. Frank Bourque to the undersigned as of April 27, 1982, in respect to the supposed values of Mr. Tillett in both of the respective corporations dramatically contradicted the representations made in the financial statements which you have provided me with. Since we are presently interested in a true determination of book value, my client again makes request of your clients to produce all of the information as requested in paragraph two of our prior letter of May 4, 1982. Until my client has been afforded the opportunity to determine the true state of fiscal affairs of each of the respective companies, it would seem completely unreasonable for your clients to expect that he accept any offer without first knowing the actual status of his interest in the businesses. This has become the more so as a result of the divergent projections made as to the status of the respective companies, first by Mr. Bourque and thereafter by Mr. Bergeron.
[45] In summary, it is not Mr. Tillett's desire to accept any tendered sum without first having been fully informed of the basis for determining his financial interest in the companies. Secondly, Mr. Tillett reasonably expects that any determination of his actual financial interest in the companies be predicated upon generally acknowledged accounting procedures. Lastly, if it is your clients' intention not to honor my client's request to be furnished with various financial information and data previously requested, I ask that you immediately advise me in order that we may undertake whatever action may next be deemed appropriate. (Emphasis added).
[46] By letter dated June 28, 1982, FNB, through its attorney, made demand on Mr. and Mrs. Tillett for payment in full of the $200,000 and $40,000 notes within five days from the date of the letter. Neither note was paid.
[47] On July 16, 1982, DWS and DWE filed a suit entitled "PETITION TO ENFORCE CONTRACT OF SALE" against Tillett. *West Page 1208 
DWS and DWE prayed for judgment "recognizing the contract of sale, ordering defendant to appear at a time and place to be designated by this court, and then and there, to deliver to plaintiffs the stock referred to herein and accept payment of the price in accordance with the Articles of Incorporation. . ." Tillett filed his answer and reconventional demand on July 30, 1982.
[48] On September 2, 1982, FNB filed an executory proceeding on the $200,000 note signed by Mr. and Mrs. Tillett and seized their new home. The property was subsequently sold. FNB then filed a suit for deficiency judgment against the Tilletts and obtained a judgment. Pursuant to this judgment FNB seized Tillett's DWS and DWE stock and his interest in this suit on August 29, 1983, but the stock was not sold at auction because the Tilletts took bankruptcy on October 4, 1983.
[49] When Tillett did not pay the $40,000 note on demand, FNB made demand on Cournoyer as the endorser of the note for payment. On September 10, 1982, DWS purchased the note from FNB for $42,276.71. On September 22, 1982, DWS made demand on Tillett for payment of the note. No payment was made. On May 11, 1983, DWS filed suit on this note against Tillett. Tillett answered and denied liability on the note to DWS.
[50] On May 4, 1983, Cournoyer Oldsmobile-Cadillac-GMC, Inc. filed suit against Tillett on an open account of $996.50, which represented various automobile repairs. On June 3, 1983, a default judgment was confirmed against Tillett.
[51] On May 16, 1983, the Tilletts were assessed $54,554.96 by the Internal Revenue Service for delinquent 1981 taxes.
[52] NO RIGHT OF ACTION
[53] (Appellants' Assignment of Error Number 8)[1]
[54] The appellants filed in this court a peremptory exception raising the objection of no right of action. La.C.C.P. art. 2163. They assert that while this action was pending in the trial court Tillett filed for personal bankruptcy and was discharged; the ownership of Tillett's causes of action are now vested in the trustee in bankruptcy; and the trustee, not Tillett, is the proper party plaintiff in these proceedings.
[55] The objection of no right of action raised in a peremptory exception determines if the plaintiff has a right or legal interest in the subject matter of the suit. The court must decide if the plaintiff belongs to the class of persons to whom the law grants the remedy being sought. McGowan v. Ramey,484 So.2d 785 (La.App. 1st Cir. 1986).
[56] When the reconventional demand was filed in 1982, Tillett was the proper party plaintiff. The record reflects that in 1983 Tillett (and his wife) filed for bankruptcy in the United States Bankruptcy Court for the Eastern District of Louisiana. Apparently, these proceedings were stayed by the Bankruptcy Court. In 1985, counsel for the Tilletts filed a motion with the Bankruptcy Court which requested, among other things, the following:
[57] That your mover desires, and does hereby move this Honorable Court, to vacate all prior stay orders affecting the subject suit and permit your mover to further said suit to a conclusion in state court proceedings in the 32nd Judicial District Court, for the Parish of Terrebonne, State of Louisiana.
[58] 4.
[59] That your mover desires that the previous Complaint to Remove Lawsuit from State Court to Bankruptcy Jurisdiction filed in this matter be dismissed, without prejudice, in order to permit your mover to advance the interest of Ray Oswald Tillett, Sr., and Juanita Manuel Tillett in the state court proceeding. *West Page 1209 
[60] On April 29, 1985, the Bankruptcy Judge issued the following order in response to this motion:
[61] ORDER
[62] Considering the above and foregoing;
[63] IT IS ORDERED by this Court that all stay orders previously issued in this matter and affecting that cause of action entitled, "Directional Wireline Services, Inc., and Directional Wireline Equipment Co., Inc. versus Ray O. Tillett", Docket No. 68,940 of the 32nd Judicial District Court, for the Parish of Terrebonne, State of Louisiana, be and they are hereby vacated;
[64] IT BEING FURTHER ORDERED that Douglas H. Greenburg, attorney for Trustee, on behalf of complainants, Ray Oswald Tillett, Sr. and Juanita Manuel Tillett, be and he is hereby authorized to withdraw the prior request for removal of the subject lawsuit from state court to bankruptcy jurisdiction, without prejudice to all rights and causes of action of all parties to the subject case number 68,940 of the docket of the 32nd Judicial District Court in and for the Parish of Terrebonne, State of Louisiana, entitled, "Directional Wireline Services, Inc., and Directional Wireline Equipment Co., Inc. versus Ray O. Tillett", together with the reconventional demand and all other incidental demands and all other relief prayed for therein.
[65] This case proceeded to judgment pursuant to this Order.
[66] Ordinarily, a bankruptcy trustee is the proper party plaintiff in a suit asserting a bankrupt's cause of action which arose prior to the filing of the petition for bankruptcy.Landry v. Calcasieu Marine National Bank, 528 So.2d 229
(La.App. 3rd Cir. 1988). However, in the instant case the bankruptcy Judge has issued an order authorizing the bankrupt (Tillett) to proceed with this case through his attorney.
[67] The objection of no right of action is without merit, and the exception is overruled.
[68] LIABILITY FOR FAILURE TO ALLOW SHAREHOLDER TO INSPECT CORPORATE RECORDS
[69] (Appellants' Assignments Of Error 1 and 2)
[70] At all times relevant hereto,[2] La.R.S. 12:103 provided, in pertinent part, as follows:
[71] A. Every corporation shall keep at its registered office, or at its principal place of business in or outside of this state:
[72] (1) Books and accounts showing the amounts of its assets and liabilities, receipts and disbursements, and gains and losses; and
[73] (2) Records of the proceedings of the shareholders, of the directors, and of committees of the board.
[74] B. Every corporation shall keep at its registered office, or at its principal place of business or at the office of a transfer agent in or outside of this state, a share register, or a stock certificate record, giving the names of the shareholders, and showing their respective addresses, as and if furnished by each shareholder, the number and classes of shares held by each, and the dates on which the certificates were issued.
[75] C. If the records required by subsections A and B of this section are not kept at the registered office, information as to their location shall be made available at the registered office. Such records may be in written form or in any other form capable of being converted into written form within a reasonable time.
[76] D. Upon at least five days' written demand, any shareholder except a business competitor, who has been the holder of record of at least two per cent of all outstanding shares of the corporation for at least six months, shall have the right to examine in person or by agent or attorney, at any reasonable time, for any proper and reasonable purpose, any and all of the records and accounts of the corporation, and to make extracts *West Page 1210 therefrom. . . . In case of stock held or acquired by, or held by or through an interposed person for, a business competitor, or a person who owns stock or is otherwise interested in a corporation which is a business competitor, he or it must own not less than twenty-five per cent of all outstanding shares of the corporation for a period of six months before he or it may demand the rights and privileges as set forth in this subsection. Nothing contained in this subsection shall impair the power of the court (1) to deny the right of inspection as to confidential matters, or (2) to order the production of documents pursuant to, and subject to the limitations of applicable provisions of the Code of Civil Procedure. (Emphasis added)
[77] La.R.S. 12:172(D) provides as follows:
[78] Any corporation, or any officer or agent thereof, which or who shall in bad faith refuse to permit the exercise of inspection rights as defined in, and limited by, R.S. 12:103, shall be liable to the shareholder or shareholders seeking to exercise such rights to the extent of the costs and expenses of any proceeding necessary to enforce such inspection rights, and for any other damages actually sustained by such shareholder or shareholders. (Emphasis added)
[79] The trial court jury found as fact that Tillett made a written demand to examine the corporate records of DWS and DWE during the period between March 30 and July 16, 1982; DWS, DWE, Darwin Miller and Cournoyer refused in bad faith to permit Tillett to inspect the records; and Tillett suffered costs, expenses, attorney fees and damages of $243,000 because of this bad faith refusal. DWS, DWE, Darwin Miller and Cournoyer contend the jury erred by finding (1) Tillett made a proper demand, (2) appellants wrongfully denied access to the records, and (3) Tillett suffered costs, expenses, attorney fees and damages of $243,000.
[80] The elements of this cause of action are (1) proper written demand by an authorized shareholder to examine and/ormake extracts of corporate records, (2) bad faithrefusal by the corporation and/or a corporate officer or agent to permit the exercise of the inspection rights, and (3) proof of (a) costs and expenses
(including attorney fees) of any proceeding to enforce
such inspection rights and (b) any other damages actually sustained by the shareholder (and caused by the bad faith refusal). A mandamus proceeding may be used to obtain compliance with La.R.S. 12:103(D). Cf. State ex rel. Bourdette v. NewOrleans Gaslight Co., 49 La.Ann. 1556, 22 So. 815 (1897);Mullens v. Pioneer Gas Co., 154 So. 377 (La.App. 2nd Cir. 1934). Further, La.R.S. 12:172(D) is a penal statute and must be strictly construed. Redemer v. Hollis, 347 So.2d 48
(La.App. 2nd Cir.), writ denied, 350 So.2d 897 (La. 1977). The burden was on Tillett to prove the elements of this cause of action. Naquin v. Air Engineered Systems Services,Inc., 463 So.2d 992 (La.App. 3rd Cir.), writdenied, 465 So.2d 735 (La. 1985).
[81] Tillett's first written request for corporate records was that in his attorney's letter of May 4, 1982. This letter does not mention La.R.S. 12:103 nor does it ask to examine (inspect) or make extracts of the corporate records. Rather, the letter states that "it is my client's desire to be furnished
with the following information" and "please forward tome" the extensive corporate records listed in the letter. (Emphasis added) In the letter of June 24, 1982, Tillett's attorney advised the appellants' attorney that "my client again makes request of your clients to produce all of the information as requested in paragraph two of our prior letter of May 4, 1982" and stated that "if it is your clients' intention not to honor my client's request to be furnished with
various financial information and data previously requested, I ask that you immediately advise me in order that we may undertake whatever action may next be deemed appropriate." (Emphasis added) The appellants filed their suit on July 16, 1982.[3] *West Page 1211 
[82] In Brandt Glass Co. v. New Orleans Housing Mart,193 So.2d 321 (La.App. 4th Cir. 1966) the attorney for a shareholder made written demand on the corporation that corporate records be brought to his (the attorney's) office for copying. This request was made pursuant of La.R.S. 12:38, the predecessor of La.R.S. 12:103. Prior to that time the shareholder's attorney had examined corporate records at the office of the corporation. The holding of Brandt is discussed in L. Cutshaw,Work of Appellate Courts-1966-1967, Corporations, 28 La.L.Rev. 379-380 (1968) as follows:
[83] In Brandt a minority stockholder brought a mandamus proceeding to force the defendant to deliver certain books and records to the office of plaintiff's attorney for inspection and copying on a Xerox machine there. The trial court ordered the corporation to comply, and the court of appeal affirmed, cautioning that its holding was narrowly confined to the facts of the case. "Our corporation statutes being silent on the place of inspection, it is our opinion that the place of inspection is not restricted as a matter of law to the offices of the corporation, but that a Trial Court has discretion to order it held elsewhere just as it has discretion to fix the time of inspection and other incidents connected therewith. But for many obvious reasons the inspection should ordinarily be ordered to be held at the place where the records are kept, that is, at the registered or principal office of the corporation, and ordinarily it would amount to an abuse of discretion to order the inspection held elsewhere. Our remarks are confined to domestic corporations having their principal offices within the territorial jurisdiction of the court". (Bolding added) (Footnote Omitted)
[84] We agree with Brandt that ordinarily the rights available to a shareholder under La.R.S. 12:103 should be exercised at the place where the corporate records arekept. If the person seeking to inspect and/or copy the records can show a good reason, the records may be taken to a place more convenient for both parties. The burden is on the shareholder to show that a place other than the corporate repository is a more convenient place.
[85] There is no evidence of record to show that Tillett's attorney made a written request to the appellants' attorney to examine and/or copy the corporate records of DWS and DWE at the corporate repository. Tillett's attorney requested that the corporate records be furnished to him (as opposed to inspected by him) and this demand did not adequately comply with the requirements of La.R.S. 12:103, and the jury verdict to the contrary is clearly wrong.
[86] What constitutes bad faith has been discussed inNaquin v. Air Engineered Systems Services, Inc.,423 So.2d 713 (La.App. 3rd Cir. 1982), writ denied,429 So.2d 156 (La. 1983) and Lanaux v. Ace Production, Inc.,396 So.2d 461 (La.App. 4th Cir. 1981). Naquin was a mandamus proceeding in which the defendant corporation was found in bad faith when it attempted to manipulate the percentage of stock ownership of the corporate shareholders by issuing new shares with subscription rights while withholding access to the corporate records so that the plaintiff shareholder could not buy the new shares and would lose his 25% ownership necessary to inspect the corporate records as a business competitor. InLanaux the shareholder made written demand pursuant to La.R.S. 12:103 on the corporate president but received no response. The shareholder then filed a mandamus proceeding to secure compliance. Despite personal service, the corporate president made no appearance. A *West Page 1212 
mandamus judgment was entered with which the corporate president failed to comply. The corporate president was then cited with contempt and ultimately failed to appear for the contempt hearing. He was then adjudged guilty of contempt of court. This was ruled to be bad faith conduct.
[87] In the instant case the evidence shows that the first request for corporate records was sent by Tillett's attorney to the appellants' attorney. Tillett did not attempt to go to the corporate repository to see the records, nor did he make a written request to do so. The appellants' attorney did send some records to Tillett's attorney and the corporate accountants also supplied some records. The appellants' attorney did not deny Tillett access to the records, he merely did not send all records requested to Tillett's attorney (presumably at the attorney's office). DWS and DWE did not attempt a stock manipulation similar to Naquin, nor did they repeatedly fail to comply with court orders issued in a mandamus proceeding brought pursuant to La.R.S. 12:103 as in Lanaux.[4] Rather, DWS and DWE were the first to apply to the court to resolve the disputes between the parties. Tillett did not file a mandamus proceeding to secure compliance with La.R.S. 12:103(D); instead he filed a reconventional demand and sought discovery of the corporate records pursuant to La.C.C.P. art. 1461, et seq.[5]
The conduct of DWS, DWE, Darwin Miller and Cournoyer between May 4 and July 16, 1982, did not constitute bad faith, and the jury verdict to the contrary is clearly wrong.
[88] These assignments of error have merit.
[89] SALE OF TILLETT'S STOCK
[90] (Appellants' Assignments Of Error 4 and 5, Tillett's Assignments Of Error C, D, E and F)
[91] The appellants contend the trial court erred by holding that DWS and DWE were obligated to purchase Tillett's stock and in fixing the price thereof at $130,000.[6] Tillett contends the trial court erred in granting a JNOV holding that Darwin Miller and Cournoyer were not solidarily liable with DWS and DWE for the purchase price of the stock.
[92] The articles of incorporation of DWS and DWE each have a right of first refusal provision for the sale of corporate stock by a shareholder. The right of first refusal in the DWE articles of incorporation runs in favor of "the other stockholders" and that in the DWS articles of incorporation runs in favor of "the corporation, and, if the corporation shall fail or refuse to accept the offer, to each of the other stockholders". A right of first refusal (pacte de preference) is an obligation in which the promisor obligates himself to give the other party the first choice in making a transaction (in this case a sale) if the promisor ever decides to make that transaction. S. Litvinoff,Consent Revisited, 47 La.L.Rev. 699, 753-757 (1987) and the cases cited therein. If the person (or persons) with the choice accepts the offer, the transaction (sale) is completed; if the person with the choice refuses the offer, the promisor is free to transact with whomever he pleases.
[93] The first issue in this cause of action is whether there was a valid sale between Tillett and DWS, DWE, Darwin Miller *West Page 1213 
and Cournoyer. In Sherman v. State Farm Mutual AutomobileInsurance Company, 413 So.2d 644, 646 (La.App. 1st Cir.),writ denied, 414 So.2d 776 (La. 1982) appears the following:
[94] The three essential elements of a sale are the thing, the price and the consent. LSA-C.C. art. 2439. There must be a meeting of the minds of the parties as to the object to be sold and the price. The price must be certain and should be fixed and determined between the parties. LSA-C.C. art. 2464.
[95] . . . . .
[96] Without a certain price there can be no sale. Both parties must agree on the thing and the price for a valid sale to be complete under LSA-C.C. art. 2456.
[97] In Benglis Sash Door Co. v. Leonards, 387 So.2d 1171, 1172-1173 (La. 1980) appears the following:
[98] C.C. art. 2439 defines the contract of sale and states the circumstances which must concur for the perfection of the contract. Thus, the contract of sale is perfected when one party consents to give a certain thing for a price in money and the other consents to give the price in order to have that thing. Although there must be consent to give and to accept a price, it is not essential that the specific sum of the sales price be stated at the time of contracting. The parties can agree that the price may be ascertained by computation or that the price may be fixed by arbitration. Or the parties can consent to buy and to sell a certain thing for a reasonable price, and when they do, the contract of sale has been perfected. The essential thing is that there be a meeting of the minds (as opposed to a disagreement) as to price. (Footnotes Omitted)
[99] In his attorney's letter of April 2, 1982, Tillett offered his stock in DWS and DWE to the corporations in accordance with Article XI of the DWS articles of incorporation. Article XI provides that (1) the offer must initially be made to the corporation, and if it fails or refuses to accept, it must be made to the shareholders, (2) the offeree shall have the right to purchase at a price of book value as of the date of the offer, (3) book value "shall be determined by the certifiedpublic accountant then employed by this corporation and shall bebinding on all parties", and (4) the offer shall be in writing and set forth the price and terms. (Emphasis added). Tillett signed the DWS articles of incorporation as an incorporator and is bound by them. DWS, DWE, Darwin Miller, Cournoyer and Landon Miller retained counsel who by letter dated April 27, 1982, advised Tillett that his clients (DWS, DWE, Darwin Miller, Cournoyer and Landon Miller) "accept the offer. . .in accordance with and in conformity to the articles of incorporation of said corporations." Tillett was advised that the corporate CPA firm would compute the value of his stock and advise him. (Article VIII of the DWE articles of incorporation provides the offer must be made to the "other stockholders at the then existing book value of said stock", but it does not provide a method of computing the value of the stock).
[100] The accountant for DWS and DWE computed the value of Tillett's shares in each corporation as a negative book value. This information was given to Tillett's attorney. By letter dated May 4, 1982, Tillett's attorney advised the appellants that "my client's appreciation of the value of his stock in the corporations is substantially different from that of Mr. Bourque [the accountant]" and that the sale of the stock "must be made in accordance with realistic valuations fully supported by factual data." By letter dated June 11, 1982, counsel for the appellants advised Tillett's attorney that "the book value of Mr. Tillett's stock is a negative figure" and offered to settle the various disputes between the parties, including the sale price of the stock, for $50,000. Tillett, through his attorney, rejected the settlement offer and advised (1) "it would seem completely unreasonable for your clients to expect that he [Tillett] accept any offer without first knowing the actual status of his interest in the business", (2) "it is not Mr. Tillett's desire to accept any tendered sum without first having been fully informed of the basis for determining his *West Page 1214 
financial interest in the companies", and (3) "Mr. Tillett reasonably expects that any determination of his actual financial interest in the companies be predicated upon generally acknowledged accounting procedures."
[101] On July 16, 1982, DWS and DWE filed suit for specific performance contending that Tillett's offer to sell in accordance with the articles of incorporation was accepted and he refused to sell. Tillett responded with an answer and reconventional demand on July 30, 1982, in which he asserted that "he has refused to sell his stock to plaintiffs but avers that his reasons for doing so. . . are most justifiable" because the negative book value was based on unaudited and unsubstantiated data and not on good accounting procedures, and thus, "plaintiffs have never validly offered to purchase his interests in accordance with the Articles of Incorporation of the respective corporations". Tillett further asserted that "[P]laintiff in reconvention therefore has acted reasonably in his refusal to sell without first being reasonably informed of the actual value of his interests."
[102] An agreement as to price is an essential element of a sale. The evidence shows there was no agreement between the parties as to the price of the DWS and DWE stock when the parties filed their actions. Further, even though the DWS articles of incorporation provided a method for computing the stock price, there were disputes between the parties about how to implement that method. Three certified public accountants testified at the trial about the proper procedure to calculate "book value" in this case. There is no evidence to show that the appellants agreed to the method used by Kliebert to calculate the book value he attributed to the corporate stock or that the appellants agreed to purchase the stock for the $125,770 price that Kliebert calculated. There was no meeting of the minds of the parties on the essential element of price. Cf. Lake v. LeJeune,226 La. 48, 74 So.2d 899 (1954); Princeville Canning Company v.Hamilton, 159 So.2d 14 (La.App. 1st Cir. 1963). The jury verdict to the contrary is clearly wrong.
[103] The appellants' assignments of error have merit.
[104] TILLETT'S CLAIM FOR AN ACCOUNTING FOR CORPORATE DIVIDENDS
[105] (Appellants' Assignment Of Error 6; Tillett's Assignments Of Error C and D)
[106] This claim is essentially a cause of action for an accounting for Tillett's proportionate share (18.18%) of the profits[7] (dividends) of DWS and DWE for the fiscal year ending April 30, 1982. The jury entered the following verdicts on this cause of action:
[107] 3.
[108] HAVE ANY ADVANCE DIVIDENDS BEEN WRONGFULLY WITHELD [sic] FROM RAY O. TILLETT BY DIRECTIONAL WIRELINE SERVICES, INC. or DIRECTIONAL WIRELINE EQUIPMENT CO., INC.?
[109] Please answer "Yes" or "No".
[110] YES -----
[111] If your answer is "Yes", answer No. 4.
[112] If your answer is "No", skip No. 4 and proceed to No. 5.
[113] 4.
[114] WHAT AMOUNT IF ANY DO YOU AWARD RAY O. TILLETT FOR ADVANCE DIVIDENDS THAT HAVE BEEN WITHELD [sic] FROM HIM? $59,000.00 ----------
[115] Although the jury verdict only found DWS and DWE wrongfully withheld "dividends" (and not Darwin Miller and Cournoyer), the first trial court judgment cast Darwin Miller and Cournoyer in solido for this obligation. On application of Darwin Miller and Cournoyer, the trial court granted a JNOV releasing them. DWS and DWE *West Page 1215 
contend on appeal that the jury erred in finding "advance dividends" were wrongfully withheld and fixing the amount thereof at $59,000. Tillett answered the appeal contending the trial court erred by granting the JNOV on this issue.
[116] Bourque testified that the profits of DWS and DWE were disbursed as either compensation to employees or dividends. He also stated that all profits of the corporations were disbursed at the end of each fiscal year, so that the value of each corporation was $0.00. Bourque admitted that as of January 31, 1982, Tillett was owed $112,669 in salary and dividends from the corporations.
[117] Kliebert testified he reviewed all of the corporate records and concluded as of April 30, 1982, DWS and DWE owed Tillett $59,470. Tillett advised Kliebert that he was paid a base salary and advance dividends. Kliebert classified the $59,470 as "an obligation on the books".
[118] Tillett testified that even though his employment with DWS and DWE was terminated as of March 30, 1982, he was paid through April 30, 1982. He received $5,400.00 per month which represented $2,700.00 as his salary as general manager and $2,700.00 as an advance on his share of the profits.
[119] After carefully reviewing all of the pertinent testimony, we conclude that the jury verdicts holding that DWS and DWE were indebted to Tillett for $59,000[8] at the end of the 1982 corporate fiscal year are not clearly wrong. The appellants' assignments of error on this issue are without merit.
[120] The jury verdicts adjudicated this cause of action between Tillett and DWS and DWE; they did not adjudicate Tillett's legal relations between Darwin Miller and Cournoyer on this cause of action. There is no evidence in the record to show that Darwin Miller or Cournoyer were personally obligated to pay corporate profits to Tillett. The trial court correctly granted the JNOV on this issue. Tillett's assignments of error are without merit.
[121] WRONGFUL INFLICTION OF MENTAL SUFFERING
[122] (Appellants' Assignment Of Error 3; Tillett's Assignments Of Error A and B)
[123] Appellants contend the jury erred in finding they acted in an atrocious, outrageous and utterly intolerable manner toward Tillett. Tillett contends the trial court erred in granting a JNOV reducing the quantum fixed by the jury from $350,000 to $25,000.
[124] Louisiana jurisprudence recognizes the tort of wrongful infliction of mental anguish under La.C.C. art. 2315.Nickerson v. Hodges, 146 La. 735, 84 So. 37 (1920). This tort is discussed in Steadman v. South Central Bell TelephoneCompany, 362 So.2d 1144, 1145-1146 (La.App. 2nd Cir. 1978) as follows:
[125] Plaintiffs' theory of liability is predicated on Nickerson v. Hodges, supra,
and Section 46 of Restatement of Torts Second. . . .
[126] The pertinent part of Section 46 and the comments thereto state: One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distresses. . .
[127] . . .Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor and lead him to exclaim, "Outrageous!" (Comment d)
[128] The conduct, although it would otherwise be extreme and outrageous, may be privileged under certain circumstances. The *West Page 1216 actor is never liable, for example, where he has done no more than to insist upon his legal rights in a permissible way, even though he is well aware that such insistence is certain to cause emotional distress. . . (Comment g) (Emphasis added)
[129] See also Muslow v. A.G. Edwards Sons, Inc., 509 So.2d 1012
(La.App. 2nd Cir.), writ denied, 512 So.2d 1183
(La. 1987); Breaux v. South Louisiana Electric CooperativeAssociation, 471 So.2d 967 (La.App. 1st Cir. 1985).
[130] In brief, Tillett points out acts such as the bank's foreclosure on his house, the failure of the appellants to buy his stock and the failure of the appellants to allow Tillett to inspect the corporate records as acts which are outrageous and atrocious. However, a review of the record does not disclose the requisite intent on the part of the appellants, or the type of outrageous conduct, necessary to establish this tort. Appellants' conduct simply was not outrageous or atrocious.[9] Appellants had a legal right to take most of the actions they did. See,Matherne v. Response Instrument Service EngineeringCorporation, 533 So.2d 1011 (La.App. 1st Cir. 1988),writ denied, 537 So.2d 1166 (La. 1989). The jury verdict to the contrary is clearly wrong.
[131] Appellants' assignment of error has merit.
[132] ADMISSIBILITY OF TAX RETURNS
[133] (Tillett's Assignment Of Error 3)
[134] Tillett asserts the trial court erred by refusing to allow the introduction of evidence pertaining to the 1980 personal income tax returns of Cournoyer and Darwin Miller.
[135] On the morning of the trial, appellants filed a motionin limine to prevent Tillett from offering any evidence of the alleged failure of Cournoyer and Darwin Miller to pay certain 1980 personal income taxes. In the motion, appellants argued that the evidence was not relevant and/or competent. After a hearing the judge granted the motion to a "limited extent" starting:
[136] I will grant the motion in limine to a limited extent, to permit that the plaintiff, Mr. Tillett, will be permitted to show the financial transactions we are talking about, only if and only to the extent that they affect him as an item of damage, to the extent that they affect the value to be given — the book value to be given to the stock, if, in fact, they affect the book value, but the motion is granted as to showing what action, if any the defendant — the individual defendants took with reference to the funds on their individual tax returns.
[137] Whether evidence is relevant or not is within the discretion of the trial judge, and his ruling will not be disturbed on appeal absent a clear abuse of discretion.Citizens Bank Trust Co. v. Consolidated Terminal Warehouse,Inc., 460 So.2d 663 (La.App. 1st Cir. 1984); Ketcher v.Illinois Central Gulf Railroad Company, 440 So.2d 805
(La.App. 1st Cir. 1983), writ denied, 444 So.2d 1220 and 1222 (La. 1984).
[138] After reviewing the record we find that the trial judge did not abuse his discretion herein.
[139] Further, the record before us does not show that the questioned personal tax returns were proffered in the trial court. Thus, the objection has been waived insofar as that documentary evidence is concerned. La.C.C.P. art. 1636;McLean v. Hunter, 495 So.2d 1298 (La. 1986).
[140] Finally, Bourque was cross-examined extensively about how the 1980 corporate and personal tax returns were prepared and about the failure of the corporations to *West Page 1217 
remit withheld taxes for that year and the failure of the shareholders to declare the tax obligation.
[141] This assignment of error is without merit.
[142] DECREE
[143] For the foregoing reasons, judgment is rendered herein (1) overruling the appellants' peremptory exception raising the objection of no right of action; (2) reversing the trial court judgment on Tillett's cause of action for bad faith refusal to permit inspection of corporate records, and judgment is rendered dismissing this cause of action with prejudice; (3) reversing the trial court judgment on Tillett's contract of sale cause of action, and judgment is rendered dismissing this cause of action with prejudice; (4) affirming the trial court judgment in favor of Tillett and against DWS and DWE for corporate profits of $59,000; and (5) reversing the trial court judgment on Tillett's tort cause of action for wrongful infliction of mental anguish, and judgment is rendered dismissing this cause of action with prejudice. The appellants are cast for 50% of all costs and Tillett is cast for 50% of all costs.
[144] REVERSED AND RENDERED IN PART; AFFIRMED IN PART.
[1] This issue was addressed in our original opinion. However, the Louisiana Supreme Court at 541 So.2d 1386 (La. 1989) vacated our judgment. Therefore, it is necessary to rule on this issue again.
[2] La.R.S. 12:103 was amended by Acts 1984, No. 841, effective July 13, 1984.
[3] The trial court judge submitted the following interrogatory to the jury:
BETWEEN THE DATES OF MR. TILLETT'S TERMINATION AND JULY 16, 1982 DID THE DEFENDANTS, HENRY R.J. COURNOYER, DARWIN A. MILLER, DIRECTIONAL WIRELINE SERVICES, INC. or DIRECTIONAL WIRELINE EQUIPMENT CO., INC. REFUSE IN A BAD FAITH MANNER TO PERMIT RAY O. TILLETT TO EXERCISE HIS INSPECTION RIGHTS AS TO THE CORPORATE RECORDS?
The validity of this interrogatory has not been questioned in this appeal. Thus, the conduct of DWS, DWE, Darwin Miller and Cournoyer which occurred after suit was filed on July 16, 1982, is not relevant to this cause of action on the issue of bad faith.
[4] There was extensive litigation in the trial court concerning what corporate records were relevant and discoverable. All of this occurred after July 16, 1982.
[5] On February 24, 1983, Tillett filed a contempt rule against DWS and DWE for failure to produce an itemized list of all corporate movable property as of April 2, 1982, as ordered by the discovery judgment rendered on September 17, 1982. This rule was heard on March 4, 1983. The minute entry for the March 4, 1983 hearing states that "the Court found that the plaintiffs [DWS and DWE] have complied with the Court order by having furnished a list of all items carried on the books of the corporation." The trial court took the issue of sanctions under advisement. The record before us does not reflect that a ruling was ever made on sanctions. Tillett does not assign this as error.
[6] Neither Kliebert nor the jury determined the individual book value of DWS and DWE. No error has been assigned concerning this. In Exhibit D-3 there is an appraisal dated October 7, 1983 by Abel A. Caillouet, Jr., senior vice president for FNB, fixing the value of Tillett's DWE stock at $114,850.56 and his DWS stock at $11,023.67, for a total of $125,874.23.
[7] The money which is the subject of this cause of action is referred to in the record and in brief as "dividends", "advanced dividends" and "profits". This semantical problem arises because DWS and DWE were subchapter S corporations for federal income tax purposes. In this context the profits of the corporations were not taxable as such; they were taxable as the individual income of the shareholders. Thus, when these corporate profits were disbursed to the shareholders they were not treated as dividends for tax purposes.
[8] Neither Kliebert nor the jury determined how much was owed individually by DWS and DWE. No error has been assigned concerning this.
[9] For example, it is not contended that DWS and DWE breached their employment contract with Tillett when his employment as general manager was terminated. In reasons for judgment on an exception the trial court observed as follows:
The allegations made by the Plaintiff in reconvention, taken as true, fail to constitute tortious conduct. The Plaintiff in reconvention was terminated from his employment but as he was not hired for a specific term and no written agreement was involved, the company was within its rights to terminate him at any time.
No error has been assigned to this ruling.