_|PARRO, J.
This appeal is one of three arising out of a single lawsuit filed by Gary W. Thornton, a minority shareholder in a closely-held corporation, Laneco Construction Systems, Inc. (Laneco).[1] The lawsuit asserted direct and derivative claims against the majority shareholders, John W. Lanehart and James Bradley Lanehart, who are officers and directors of Laneco, for actions they took after Thornton resigned as an officer and director of the company. In this appeal, Thornton challenges a trial court judgment that granted a writ of mandamus, directing the Laneharts to produce certain records of the corporation for inspection and copying by Thornton, but limiting that production because Thornton had formed a company in direct competition with Laneco. We affirm.
FACTUAL BACKGROUND
In July 1987, Thornton bought a one-third interest in Laneco. He, John W. Lanehart, and James Bradley Lanehart each owned 433 shares and each also held a position with the company as an officer and director. In March 1996, Thornton abruptly resigned as president and the following month, he also resigned from the board of directors. Immediately before resigning from the board and leaving Laneco, Thornton incorporated a competing company, Thornco, Inc. (Thornco). Both Laneco and Thornco are in the business of commercial construction of drywall, steel stud walls, drywall finishing, ceilings, and application of synthetic plaster. All parties concede that Thornco is a direct and effective competitor of Laneco, often bidding on the same jobs. In fact, as early as May 1996, Thornco was the successful bidder against Laneco on a major project in Baton Rouge.
On November 13, 1996, through a letter from his attorney, Thornton asked for certain financial and other information concerning Laneco.[2] Counsel for Laneco delivered some of the requested information on November 20, 1996, but refused to kprovide certain information, claiming some of the requested reports were not yet complete and some information would not be provided because it was confidential and its disclosure would put Laneco at a competitive disadvantage vis-a-vis Thornco. On November 26, 1998, Thornton filed a lawsuit seeking, among other things, a writ of mandamus directed to the Laneharts, compelling them to produce the Laneco records, pursuant to LSA-R.S. 12:103. After a hearing on Thornton’s rule to show cause why such records should not be produced, the trial court granted the writ of mandamus, subject to certain limitations. In this appeal, Thornton contends the court erred by limiting his inspection, by not finding the Laneharts in bad faith, and by not *1115 awarding damages for their bad faith refusal to allow him to inspect the records of Laneco.
APPLICABLE LAW
A shareholder’s right to examine the books and records of a corporation in which he holds an ownership interest is governed by LSA-R.S. 12:103, which provides, in pertinent part:
D. (l)(a) Upon at least five days’ written notice[,] any shareholder, except a business competitor, who is and has been the holder of record of at least five percent of the outstanding shares of any class of a corporation for at least six months shall have the right to examine, in person or by agent or attorney, at any reasonable time, for any proper and reasonable purpose, any and all of the records and accounts of the corporation and to make extracts therefrom.
* * * * * *
(2) In case of stock held or acquired by ... a business competitor or a person who owns stock or is otherwise interested in a corporation that is a business competitor, he or it must own not less than twenty-five percent of all outstanding shares of the corporation for a period of six months before he or it may demand the rights and privileges as set forth in this Subsection.
(3) Nothing contained in this Subsection shall impair the power of the court:
(a) To deny the right of inspection as to confidential matters; or
(b) To order the production of documents pursuant to and subject to the limitations of applicable provisions of the Code of Civil Procedure.
¡jThe penalties for refusing to allow inspection of the corporation’s records are provided in LSA-R.S. 12:172(D), as follows:
Any corporation, or any officer or agent thereof, which or who shall in bad faith refuse to permit the exercise of inspection rights as defined in, and limited by, R.S. 12:103, shall be liable to the shareholder or shareholders seeking to exercise such rights to the extent of the costs and expenses of any proceeding necessary to enforce such inspection rights, and for any other damages actually sustained by such shareholder or shareholders.
The leading case concerning the scope of production under LSA-R.S. 12:103 is Matherne v. Heffron, 496 So.2d 446 (La.App. 1st Cir.1986). In Matheme, this court examined the intent of the statute to determine which corporate records are subject to examination by the requesting shareholder, and held that the shareholder was entitled to examine:
1. The general ledger of the corporation which shows the cumulative total of all its charts of accounts including its assets and liabilities, gains and losses. This book of account will show the financial position of the corporation at any given time based upon all of its resources.
2. Cash journal of all receipts. This book of account reflects every penny received by the corporation, item by item, listing from whom it was received and the amount received. In addition it list[s] deposits made by the corporation.
3. Cash journal of all disbursements made by the corporation. This book of account reflects every disbursement made by [the corporation,] showing the individual or corporation to whom it was disbursed and the amount of the disbursement.
4. Each unaudited quarterly financial statement of the corporation reflecting the revenues[, their] sources[,] and the expenses of operation of [the corporation].
5. The audited financial statements of [the corporation,] reflecting its overall standing on a semi-annual and annual basis.
6. The record books of all the proceedings of the shareholders and directors and any committees or boards of the corporation, including minutes of shareholders and board of directors meetings, share register book, and all corporate records of [the corporation].
7. Any and all State and Federal tax returns filed by [the corporation].
Matheme, 496 So.2d at 448-49. The court in Matheme rejected the shareholder’s request to examine the originals of every cancelled check, deposit slip, or invoice of the ^corporation, and accepted the corporation’s *1116 suggestion that the above list of records would be an appropriate disclosure under the statute. The court specifically noted that the record did not establish whether the requesting shareholder was a business competitor of the corporation.
In Naquin v. Air Engineered Systems & Services, Inc., 463 So.2d 992 (La.App. 3rd Cir.), writ denied, 465 So.2d 735 (La.1985), the minority shareholder was fired from his position with the company and was later denied access to all corporate records because he had started a competing business. The court there found the corporation was in bad faith because, in addition to denying the plaintiffs request to inspect the records, the majority shareholders had issued and subscribed to a number of shares sufficient to reduce the minority shareholder’s position to less than the 25 percent required by the statute for a shareholder/competitor to inspect the records. The court affirmed a judgment awarding penalties, attorney fees, and all costs to the minority shareholder whose access to the records had been denied. The court commented concerning its conclusions:
Since Dubois and Hoffpauir fired Naquin and were attempting to buy him out at a price that he felt was inadequate to fairly compensate him, it was imperative that Naquin be allowed to examine the corporate records to determine the actual value of the corporation and its financial condition, to determine the true value of his shares.
Naquin, 463 So.2d at 995.
In Directional Wireline Services, Inc. v. Tillett, 552 So.2d 1201 (La.App. 1st Cir.), writs denied, 551 So.2d 1343, 1344 (La.1989), this court confirmed that a mandamus proceeding was an appropriate mechanism to obtain compliance with a shareholder’s statutory right to inspect corporate records. Directional Wireline, 552 So.2d at 1210. The court defined the elements of a cause of action for bad faith refusal to allow inspection of corporate records, as:
(1) proper written demand by an authorized shareholder to examine and/or make extracts of corporate records, (2) bad faith refusal by the corporation and/or a corporate officer or agent to permit the exercise of the inspection rights, and (3) proof of (a) costs and expenses (including attorney fees) of any proceeding to enforce such inspection rights and (b) fcany other damages actually sustained by the shareholder (and caused by the bad faith refusal).
Directional Wireline, 552 So.2d at 1210. The burden of proving the elements of the claim, including bad faith, is on the person claiming it. Directional Wireline, 552 So.2d at 1210. The court found the corporation was not in bad faith for refusing to allow examination of certain of the records, noting that the corporation’s attorney and accountant did send some records and did not engage in any of the tactics which had justified imposition of penalties in Naquin and other cases. Directional Wireline, 552 So.2d at 1212.
DISCUSSION
In the case before us, there is no question that Thornton meets the statutory criteria for inspection of corporate records by a shareholder/competitor, having owned over 25% of the corporation for well over six months, as found by the trial court. The parties and the trial court used the Matheme case as a starting point to determine which records might need to be produced. After hearing testimony from both sides concerning the competitive nature of Thornton’s new business, the information required to value his ownership interest in Laneco, and the potential disadvantage to Laneco of revealing certain confidential details, the court balanced the interests of both parties and ordered a more limited production than what was described in Matheme.
The court ordered Laneco to annually provide Thornton a complete copy of its state and federal tax returns, including government printed schedules, but not including the itemized statements attached to and supporting the schedules. The corporation was ordered to provide, on a quarterly basis, the record books of all proceedings of the shareholders and directors and a compilation or summary of the quarterly financial statement of the corporation. Laneco was also ordered to provide a complete copy of its annual *1117 audited financial statement to a certified public accountant designated by Thornton, who could review and retain it to assist Thornton in valuing his interest and monitoring the management of the corporation. However, Thornton’s CPA was to sign a confidentiality agreement concerning detailed information in the financial statement. _j¡A compilation or summary of the information in the financial statement was to be provided directly to Thornton by the CPA who prepared the report for Laneco. Thornton’s CPA could discuss the information in the compilation with Thornton and his attorney, but was not to disclose detailed confidential information to them. If Thornton’s CPA noted any discrepancies between the compilation and the annual financial statement, the parties could return to the trial court for permission to review the supporting documentation. The court did not order production of the first three items on the Matheme list, namely the general ledger of the corporation, cash journal of all receipts, and cash journal of all disbursements. The trial court retained jurisdiction over the subject matter of this judgment for purposes of any further-litigation concerning the production of corporate records.
After reviewing the record, we conclude the trial court’s decision was a reasonable exercise of the court’s discretion under the statutes and jurisprudence. In support of his position, Thornton presented the testimony of John C. Gautreau, a certified public accountant. He testified concerning the information he would need to assist Thornton in valuing his- interest in Laneco; Gautreau’s list was more extensive and detailed than the documentation required in Matheme. Gau-treau candidly admitted he would not recommend to one of his clients that such detailed information be voluntarily provided to a competitor, because such disclosure would put that client in an unfair competitive posture. He said the audited financial statement for any given year . .provides you with confidential information you wouldn’t want a competitor to have.” He also acknowledged that he would be reasonably assured of the reliability of a compilation based on an audited financial statement, provided the compilation was prepared by the same CPA who prepared the audited financial statement and was accompanied by that CPA’s statement that the compilation was an accurate summary. However, Gautreau also clarified that the information in the audited financial statement was not so specific that a competitor could learn how particular jobs, materials, or labor fcwere priced. This degree of detail could only be obtained by analyzing the cash receipts journal, eash disbursements journal, and general ledger.
William D. Nesbit, a CPA who had prepared Laneco’s audited financial statements since its inception, testified, on behalf of La-neco. He confirmed that the general ledger showed detailed transactions of the corporation and identified those transactions by dates, names, amounts, account numbers, and job numbers. A review of that information by a competitor would provide labor costs, job costs, and administrative expenses. The eash receipts journals would identify the customers and show how much they were billed and when and how much they paid; the disbursement journals would show who supplied materials and services to Laneco, and how much and when they were paid. Nesbit also discussed the type of detailed information which might be contained in the footnotes to the audited financial statements, including the volume of business, the status of jobs, the dollar amount of those jobs, completion dates, and the number and amounts of jobs booked during the’ fiscal year. If there were material legal problems or labor problems on a particular job, that information would also be in the footnotes. However, he admitted there was no such information concerning particular jobs in the footnotes to the audited financial statements for 1994,1995, or 1996. Detailed information concerning the cost breakdown of jobs, materials, labor, allocated costs, and administrative expenses could also be found in the supporting documents for the schedules attached to the corporation’s tax returns. Responding to a question from the trial court, Nesbit indicated there was no simple way in which the information in the general ledger could be compiled and summarized to eliminate the details and still provide relevant information.
*1118 John Lanehart also testified that the detailed information provided on the general ledger and cash receipts and disbursements journals would enable a person to determine costs and income associated with a particular job. He stated that Laneco’s business is very competitive and generally requires bidding on projects. He also indicated that, besides not wanting a competitor to have certain information about ^Laneco, he would also not want this information disseminated to the general contractors to whom bids were submitted. For instance, he would not want the general contractors to know the gross profit of the company, because pressure could be brought to reduce that profit margin on a particular job. Similarly, if general contractors knew Laneco had a strong cash position at any given time, they might use this information to justify delaying payments. Lanehart stated that, based on Thornton’s activities since he left Laneco, he would not trust him to have continuing access to that type of information, saying, “I think if he could use it to his advantage, he would.”
The record shows that, in response to Thornton’s initial request for corporate records, he was immediately provided with some of the documents and other information was summarized in compilations that would assist him in valuing his shares. Within less than two weeks after he first asked for access to the corporate records, he filed this lawsuit, seeking a writ of mandamus for the remaining documents, which were withheld on the basis of confidentiality. Although the court did not specifically state that there was no bad faith on the part of the Laneharts, we find no manifest error in the trial court’s implicit factual finding to this effect, based on this record.
The testimony of all the witnesses, including Thornton’s own expert, confirms that some of the information being sought by Thornton could be used against Laneco, but many of those same details, particularly in the audited financial statement, would be needed for him to reasonably evaluate his ownership interest. LSA-R.S. 12:103 allows the court to deny access to confidential information, or to limit production in accord with the Louisiana Code of Civil Procedure. LSA-C.C.P. art. 1426(A)(7) allows a court to deny discovery of confidential commercial information or specify that it be disclosed only in a designated way. In this case, the trial court structured the disclosure of corporate records in such a way that Thornton could have the assistance of a professional in valuing his ownership interest in Laneco and in monitoring the activities of the corporation to protect his interests. These were the legitimate purposes lipfor which he requested the corporate records. Yet, by requiring his CPA to maintain the confidentiality of the details of Laneeo’s operations, the trial court effectively blocked Thornton from misusing such information to obtain a competitive advantage for Thornco. We find no legal error in this judgment.
CONCLUSION
For the foregoing reasons, the judgment of the trial court is affirmed and all costs of this appeal are assessed to Thornton.
AFFIRMED.

. The other two appeals, bearing docket numbers 97 CA 1995 and 97 CA 2871, were also decided this date.

. Thornton and the Laneharts were also owners of several property management entities. Financial information concerning these companies was also requested, and eventually was provided. It is only the Laneco records which are the subject of the writ of mandamus and this appeal.